## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

JANE DOE,

        Plaintiff,

    v.

CALVIN UNIVERSITY, SILLIMAN
UNIVERSITY, and DWIGHT TENHUISEN,

        Defendants.

Case No. _____

Hon.

## COMPLAINT AND JURY DEMAND

NOW COMES Plaintiff, Jane Doe ("Ms. Doe"), by and through her undersigned attorneys, and for her Complaint, alleges as follows:

## INTRODUCTION

1.     In January of 2020, Plaintiff Jane Doe ("Ms. Doe") was a senior at Calvin University ("Calvin") when she traveled to the Philippines during winter break for a group study abroad program (the "Program") sponsored by Dr. Dwight TenHuisen ("Dr. TenHuisen"). A devout Christian and a fourth-generation Calvin student, Ms. Doe entrusted Calvin, Dr. TenHuisen, and Calvin's partner university in the Philippines, Silliman University ("Silliman"), to take certain precautions for her safety, as they said they would.

2.     Silliman selected student "buddies" to serve as hosts and translators for the Calvin students. During the end-of-program celebration, a Silliman "buddy" (the "Assailant") laced Ms. Doe's drink with an incapacitating drug, drove her to an unrecognized location, and raped her as she fell in and out of consciousness. Some of the last words that Ms. Doe recalls from that night were the Assailant telling her it was his dream to be with an American.

1

3.      No one intervened to prevent Ms. Doe from being led away by the Assailant, given the position of trust conferred on him by Dr. TenHuisen, Calvin, and Silliman.  No one noticed that the Assailant had not delivered Ms. Doe safely to her hotel as he offered to do, given the violation of safety protocols committed by Dr. TenHuisen and Calvin when arranging accommodations and assigning Ms. Doe to a hotel room by herself.  No one acted to protect or help Ms. Doe, given the inexcusable failure of Dr. TenHuisen, Calvin, and Silliman to follow policies for training and supervising participants and staff.  Dr. TenHuisen, Calvin, and Silliman demonstrated a blatant disregard for Ms. Doe's safety and well-being.  Ms. Doe now brings this case to hold the Defendants accountable for their wrongdoing.

## PARTIES

4.      The Plaintiff Jane Doe is a graduate of Calvin University who currently resides in Southern Pines, North Carolina.

5.      The defendant, Calvin University, is a private Christian university and a recipient of federal financial assistance with its principal place of business located at 3201 Burton SE, Grand Rapids, Michigan 49546.

6.      The defendant, Silliman University, is a private university located in Dumaguete, Philippines.

7.      The defendant, Dwight TenHuisen, is a professor of Spanish and Latin American Studies at Calvin who, on information and belief, currently resides in Michigan.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because the plaintiff does not share citizenship with any defendant and the amount in controversy exceeds $75,000.

2

9.     This Court has personal jurisdiction over Calvin because Calvin has its principal place of business in Michigan.

10.     This Court has personal jurisdiction over Silliman because Silliman transacted business within the state of Michigan and subjected itself to Michigan law under the terms of its Memorandum of Agreement with Calvin. *See* Exhibit A, Memorandum of Agreement ("MOA").

11.     This Court has personal jurisdiction over Dr. TenHuisen because he is domiciled in the state of Michigan.

12.     Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to Ms. Doe's cause of action occurred in this District.

## FACTUAL ALLEGATIONS

### *Calvin's Recruitment of Ms. Doe*

13.     For four generations, Ms. Doe's family has attended Calvin and provided ongoing loyalty and support to their beloved alma mater.

14.     Ms. Doe was raised in the church; when attending Calvin, her Christian faith was central to her morality and present in all aspects of her life.

15.     As a child, Ms. Doe looked forward to attending Calvin and pursuing her college education at an institution that she believed would provide a caring, nurturing, and faith-based environment as she transitioned from high school to adulthood.

16.     Ms. Doe, in all respects, is a textbook Calvin recruit.  Calvin held itself out to care as much about Ms. Doe as Ms. Doe cared about Calvin.

17.     During her senior year at Calvin, Ms. Doe looked forward to traveling to the Philippines with Calvin students and Dr. TenHuisen.  In her second trip abroad with Calvin, Ms. Doe took comfort in knowing that the university she trusted would provide for her safekeeping.

18.     Calvin betrayed Ms. Doe's trust through its woefully defective planning and irresponsible execution of an international trip, and indeed, Ms. Doe was anything but comfortable and secure.  If Ms. Doe had known of Calvin's failures prior to embarking on the trip, she never would have participated in the Program.

*Calvin University's Policies*

19.     At all times material, Calvin operated a private Christian university which provides undergraduate and graduate courses of study at various locations in Grand Rapids, Michigan to students in consideration for the payment of tuition, fees, and other related expenses.

20.     Calvin provided additional services and amenities to students as part of a package of education-related goods and services, in consideration for the payment of tuition, fees, and other expenses, to encourage potential students such as Ms. Doe to enroll and attend Calvin.

21.     Among the additional services and amenities that Calvin provided to its enrolled students are the interim programs, conducted by Calvin during the month of January and offering students both on-and off-campus educational experiences. *See* Exhibit B.

22.     These interim programs allowed students to "escape the cold Michigan winter to explore the landscapes of Hawaii or contemplate a pilgrimage in Florence, Italy." *See* Exhibit B. Tuition for the interim was included in Calvin's annual tuition fee.  *Id.*

23.     Calvin maintained policies and procedures for the interim programs relating to student safety and protection against sexual assault, but these policies were outdated and not readily available and accessible for students, including Plaintiff, to review.

4

24.     Upon information and belief, Calvin's policies required the following pre-Program planning:

a. Submission of a detailed final itinerary and required information about the interim program destination;

b. Training for faculty instructors sponsoring the Program;

c. Development of a risk management plan, created by the faculty instructors sponsoring the Program, in accordance with a model template developed by Calvin (*see* Exhibit C) and including information from resources provided by Calvin to faculty instructors regarding sexual assault and sexual harassment (*see* Exhibit D).

d. Faculty-led orientation meetings for student participants reviewing the risk management plan; and

e. Faculty-led discussions with student participants regarding sexual assault and harassment in order to increase awareness and teach students the steps to take for reducing vulnerability (*see id.*).

25.     Calvin represented to students and their parents that the Programs were safe and that sufficient protective measures were being taken.  Calvin warranted to students and parents that it was "especially committed to [student] safety and well-being" during the Program.  *See* Exhibit E.

26.     Calvin was well aware of the risk of sexual assault for female students, especially during international travel, but Calvin failed to follow its policies and procedures for protecting against sexual assault.

*Silliman University Obligations*

5

27.     Silliman University is a private university located in Dumaguete, Philippines.

28.     Silliman and Calvin entered into a Memorandum of Agreement ("MOA") whereby the parties "agreed to develop collaborative activities in academic areas of mutual interest, on the basis of equality and reciprocity."  *See* Exhibit A at p. 1.

29.     Silliman agreed to "accept such collaborative offer and provide CALVIN's students with the appropriate cultural exposure." *Id.*

30.     Pursuant to the MOA, Silliman was to "prepare the program plan" subject to Calvin's approval including a schedule of class sessions and outside activities. *Id.* at 2.

31.     Further, Silliman agreed to owe a duty of care to the student participants to the extent that it was "responsible for [Calvin students'] security and safety when they are outside the campus during business and cultural exposures." *Id.*

32.     Silliman and Calvin agreed that "[t]he personnel provided by [Silliman] will be under the control of [Silliman], regardless of whether Calvin provides daily direction and supervision." *Id.* at 3.

33.     At all times material, the defendant Calvin represented to students and their parents that Silliman was Calvin's partner in implementation of the Program, and likewise, that Silliman would take sufficient protective measures to keep Calvin participants, including Plaintiff, safe.

*Sexual Assault on College Campuses*

34.     Sexual violence and assault on college campuses is a widespread nationwide problem.

35.     According to the Department of Justice, 18-24 year-old female college students are three times as likely to be victims of sexual violence over all females.[1]

---

[1] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Rape and Sexual Victimization Among College-Aged Females, 1995-2013 (2014).

36.     Among all graduate and undergraduate students, 13% of students experience rape or sexual assault through physical force, violence, or incapacitation.[2] Of those 13%, 9.7% are female.[3]

37.     Among undergraduate students, a shocking 26.4% of female students experience rape or sexual assault through physical force, violence, or incapacitation.[4]

38.     Sexual violence is more prevalent at college compared to other crimes, with there being two sexual assaults for every one robbery.[5]

39.     In 2018, Calvin professor Rachel Venema completed a campus-wide survey on sexual assault during the 2016-2017 academic year.[6] Thirty-one percent of Calvin students completed the survey. The same survey was conducted in 2014.[7]

40.     The survey showed that 7% of responding students had experienced sexual assault in the academic year of 2016-2017.[8] This number was up from the 5.5% of students who experienced sexual assault in 2014.[9]

41.     According to the survey, a staggering 91% of those victims of sexual assault were women; 81% of the assaults occurred off-campus.[10]

42.     Importantly, Professor Venema explained that the survey did not align with the number of assaults in Calvin's campus safety report because of discomfort in reporting.[11]

---

[2] David Cantor, Bonnie Fisher, Susan Chibnall, Reanna Townsend, et. al. Association of American Universities (AAU), Report on the AAU Campus Climate Survey on Sexual Assault and Sexual Misconduct (January 17, 2020).
[3] Id.
[4] Id.
[5] National Crime Victimization Survey, 1995-2013 (2015)
[6] Yolando Chow, Survey tracks recent changes in sexual assault rates at Calvin, April 26, 2018, https://calvinchimes.org/2018/04/26/survey-tracks-recent-changes-in-sexual-assault-rates-at-calvin/
[7] Id.
[8] Id.
[9] Id.
[10] Id.
[11] Id.

43.     The Department of Justice published data revealing that 4 out of 5 female student victims do not report their assaults.[12] Twenty percent of female students did not report their assaults for fear of reprisal, 26% because they believe it was personal, 12% did not report because they believed it was not important enough to report, and 10% did not report because they did not want the perpetrator to get in trouble.[13]

44.     Indeed, only 20% of female student victims aged 12-24 report their assaults to law enforcement.[14]

*The Program in the Philippines*

45.     Ms. Doe participated in the January 2020 Program in the Philippines. The Program had 22 student participants from Calvin and the faculty sponsor for the Program was Dr. TenHuisen. The Program was scheduled for January 7 to January 29, 2020.

46.     The Program was implemented by Silliman, and Silliman faculty, staff, and students delivered all educational and experiential instruction to Calvin students.

47.     All travel arrangements in the Philippines were made by Calvin and Dr. TenHuisen. However, Calvin did not arrange Ms. Doe's travel to Chicago for departure to the Philippines, which was a change in practice from previous years and inhibited Ms. Doe from building a relationship with other participants prior to their arrival in the Philippines.

48.     Prior to the Program, Dr. TenHuisen held an orientation session with students, including Plaintiff. The orientation session lasted only approximately one and one-half hours. No other orientation meetings were held prior to travel.

---

[12] Department of Justice, Office of Justice Programs, Bureau of Justice Statistics,  Rape and Sexual Victimization Among College-Aged Females, 1995-2013 (2014).
[13] *Id.*
[14] *Id.*

49.     Despite the requirements and protocols set forth in the Sexual Assault Protocol, the orientation session did not address reducing vulnerability to sexual assault and/or harassment.  *See* Exhibit F.  During the orientation session, Dr. TenHuisen conveyed that female Participants should dress conservatively, not go out alone, and limit alcohol consumption, but these warnings related to general student conduct and were not tied to prevention of sexual assault. The orientation session hard copy handouts directed Participants to review safety information on a student orientation page but failed to provide a web address that students could utilize to do so.  *See id.* at p. 4.

50.     Upon arrival in the Philippines, Calvin and/or Silliman relied on a 63-page PowerPoint presentation to provide Participants with information related to the Program. *See* Exhibit G.  Similar to the pre-travel orientation session, the presentation did not address sexual assault and/or harassment, and indeed, the words assault and harassment do not appear in the slides. *See id*.

51.     In direct violation of the Sexual Assault Protocol, Dr. TenHuisen never discussed the topics of sexual assault or harassment with the participants. Students were not provided with any information regarding general awareness, steps to take to reduce vulnerability, and steps to take in the event of an incident of assault or harassment.

52.     Ms. Doe participated in an interim program trip to Cambodia the year before her travel to the Philippines.  In all respects, Dr. TenHuisen and Calvin's preparation of students for travel to the Philippines was significantly less comprehensive compared to the preparation Ms. Doe received prior to her travel to Cambodia.

53.     Upon information and belief, in contravention of Calvin's normal procedures, there was no other chaperone on the trip; Dr. TenHuisen was the sole faculty member from Calvin during the Program.  Dr. TenHuisen requested a waiver to not have additional chaperones on the Program.

54.     Upon information and belief, Dr. TenHuisen's intention was to use missionaries and/or faculty members from Silliman instead of Calvin employees to provide supervision and instruction during the Program.

55.     For safety measures, Dr. TenHuisen employed a partner system whereby the participants were divided into groups of two. Male participants were partnered with other males and female participants were partnered with other females.

56.     Due to the odd number of female participants, Ms. Doe was "leftover" and, therefore, was not assigned a partner.

57.     Hotel rooms were assigned based on the partner system; Ms. Doe was assigned to a room by herself.

58.     Upon information and belief, the Assailant was a student at Silliman University as a business major at the time of the Program, and the Assailant was specifically chosen by Silliman to serve as a "buddy" for Calvin students.

*The Assault*

59.     On the evening of January 17, 2020, Ms. Doe was expected to attend a dinner and celebration of the end of the trip with her Calvin classmates and the Silliman "buddies" accompanying Calvin students during the Program (the "Dinner"). *See* Exhibit A at Annex A p. 6.

60.     Dr. TenHuisen attended the first part of the Dinner, which was located on the Silliman campus.

61.     The Silliman "buddies" invited Ms. Doe and her classmates to accompany them to Café Racer, a bar and dance club located in Dumaguete, Philippines, to continue their celebration.

Dr. TenHuisen did not join them, and rather, he told the students via text message to go out, have fun, and not do anything stupid.

62.     All 22 of the Calvin student participants accompanied the six Silliman "buddies" to Café Racer.

63.     Ms. Doe's choice, at the time, was either to accompany the group to Café Racer or return to her hotel room alone.  Ms. Doe made the choice she believed to be the safest, and as encouraged by Dr. TenHuisen, she joined the group as they continued their celebration.

64.     At Café Racer, Ms. Doe ordered one beer and consumed a few sips before excusing herself to the restroom at approximately 10:30PM.

65.     Upon returning to the table, one member of the group whom Ms. Doe identified as the Assailant stated that he re-filled her glass.

66.     Ms. Doe believed this to be odd because she did not ask for more to drink. However, as Ms. Doe was with her friends and classmates from Calvin and Silliman, she did not suspect anything insidious.

67.     Unbeknownst to Ms. Doe, the Assailant had laced her drink with an incapacitating drug.

68.     Ms. Doe drank from the laced glass and went to dance with her classmates for roughly 20-25 minutes, at which point she began to feel disoriented, physically weak, and exhausted.

69.     Ms. Doe exited the dance floor and walked back to the area where her classmates were and sat down on a couch.

70.     Ms. Doe was finding it difficult to keep her eyes open and was so tired that she thought she might fall asleep on the couch. When Ms. Doe did try and open her eyes, they would sting and burn.

71.     The Assailant approached Ms. Doe and offered to escort her safely back to her hotel, where she could return to her room alone and rest.

72.     Ms. Doe left Café Racer with the Assailant.  Instead of taking Ms. Doe to her own hotel, the Assailant took Ms. Doe to an unrecognized hotel room where he raped her.

73.     Ms. Doe's next memory was the Assailant handing Ms. Doe her dress and undergarments, and her walking out. Ms. Doe remembers it being dark outside.

74.     The Assailant then took Ms. Doe back to her hotel where she again lost consciousness. Ms. Doe's next memory was when she woke up in her room the next morning.

75.     When Ms. Doe woke up in her hotel room on the morning of January 18, 2020, she discovered that her clothes were inside out, backwards, and she was missing an earring. Ms. Doe also had blood on her clothing and experienced physical pain indicative of a sexual assault. Ms. Doe also felt physically ill and dehydrated.

76.     On the morning of January 18, 2020, Ms. Doe received a text message from the Assailant of a "face emoji" with an index finger over pursed lips, as if the Assailant was telling her to be quiet. The Assailant also told Ms. Doe that they could pretend nothing happened and that he would get into trouble if she said anything.

77.     In response to the Assailant's text message, Ms. Doe asked him the following four questions:

        a. Ms. Doe: "Did we have sex?" The Assailant answered, "Yes."

        b. Ms. Doe: "Did we use protection?" The Assailant answered, "No."

c. Ms. Doe: "How did I get home?" The Assailant answered, "I drove you home."

d. Ms. Doe: "Did you slip anything into my drink?" The Assailant answered that it was rare to have drugs in the Philippines and he did not have access to drugs.

78.    Ms. Doe told her mother on January 18, 2020 that she was stressed, sad, and that she had no one on the trip with whom she could confide.  During a phone conversation the next day, Ms. Doe told her mother that she was afraid to tell anyone what was wrong.

79.    Fearing for the safety of her child, Ms. Doe's mother arranged for Ms. Doe to leave the Program early and fly to California on January 25, 2020. There, Ms. Doe met her mother and contacted local authorities.

80.    Ms. Doe was reluctant to inform Dr. TenHuisen or anyone else from Calvin about her assault because she was concerned she would get in trouble.  Calvin's woefully inadequate training of Participants relating to safety and security conveyed to Ms. Doe that she was to blame.

81.    Prior to flying to California, Ms. Doe told two of her classmates and Dr. TenHuisen about the assault.

82.    Upon arriving in California, Ms. Doe had a medical exam conducted at Santa Valley and reported the assault to the Sherriff's Office in Santa Clara County, California.

83.    Ms. Doe also reported the assault to Calvin, who in turn, drafted an Incident Report that it forwarded reported it to Silliman. *See* Exhibit H.

84.    The Incident Report states that another student complained to classmates she had experienced unwanted sexual contact from the Assailant during the home stays in January 2020. *See id.*

85.     Further, the Incident Report states that on the night of the assault, another Calvin student expressed concern when she noticed that the Assailant left the bar alone with Ms. Doe. *See id.*

86.     Despite previous misconduct by the Assailant and the concern of her classmates, no one intervened to help Ms. Doe during the assault.  Dr. TenHuisen did not report the assault to local authorities and, upon information and belief, took no remedial measures following Ms. Doe's report of the assault.

### COUNT I: NEGLIGENCE
**(against Calvin University)**

87.     Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

88.     Calvin owed a duty to Ms. Doe, as its student and participant in the Program, to use ordinary care and act as a reasonably prudent person would in the planning and implementation of the Program.  Calvin's duty included, but was not limited to, the following:

> a. a duty to exercise reasonable care in protecting Program participants from the risk of sexual assault while traveling in the Philippines;
>
> b. a duty to exercise reasonable care in planning hotel accommodations to protect Program participants from the risk that a student staying alone would be unable to alert others when in harm's way;
>
> c. a duty to exercise reasonable care in maintaining updated policies and protocols to protect students from the foreseeable risk of sexual assault while traveling abroad;

14

d. a duty to exercise reasonable care in implementing its policies and protocols to alert Program participants to the risk of sexual assault while traveling in the Philippines;

e. a duty to exercise reasonable care in providing guidance to Program participants for mitigating the risk of sexual assault while traveling in the Philippines;

f. a duty to exercise reasonable care in assigning an adequate number of staff sponsors to supervise Program participants during their travel abroad;

g. a duty to exercise reasonable care in adequately evaluating, training, and supervising staff sponsors of the Program;

h. a duty to exercise reasonable care in selecting, vetting, administering criminal background checks for, and supervising student "buddies" assigned to the Program;

i. a duty to adequately supervise Silliman's performance of its duties under the MOA.

89. Calvin's duty arose when it created, offered, advertised, administered, and took responsibility for the Program.

90. Calvin's duty arose from a voluntary undertaking when it determined that it would control all aspects of travel arrangements, accommodations, activities, and safety and security for students participating in the Program.

91. Calvin's duty arose from a special relationship with Ms. Doe when she entrusted Calvin with full control over all aspects of travel arrangements, accommodations, activities, and when Calvin fostered a special relationship between Program participants and Silliman "buddies."

92. Ms. Doe's sexual assault was foreseeable and likely, and Calvin recognized the risk of sexual assault for female students participating in the Program in the Philippines when it

developed its own policies and procedures requiring training and risk mitigation for the same. Calvin's violation of its own policies and procedures relating to training, supervision, and housing caused Ms. Doe's assault.

93.     The burden on Calvin to prevent sexual assault by following its own policies and procedures is very low and Calvin was able to comply with its duty.

94.     Calvin University breached its duty by its acts and omissions including, but not limited to, the following:

a. failing to protect Ms. Doe from the foreseeable risk of sexual assault while traveling in the Philippines;

b. failing to protect Ms. Doe from the foreseeable risk of sexual assault at the hands of the Assailant;

c. assigning Ms. Doe to a hotel room all by herself;

d. failing to update its policies and protocols for international travel;

e. failing to provide Participants with training on sexual assault and harassment during the pre-Program orientation meeting or at any other time;

f. allowing Dr. TenHuisen—a male—a waiver to act as the sole staff member accompanying 22 Participants, half of which were female, to the Philippines;

g. failing to adequately evaluate, train, and supervise Dr. TenHuisen;

h. failing to adequately respond to Ms. Doe's assault;

i. failing to adequately select, vet, administer criminal background checks for, and supervise student "buddies" assigned to the Program;

j. failing to adequately supervise Silliman's performance of its duties under the MOA.

95.     As a direct and/or proximate result of Calvin's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT II: GROSS NEGLIGENCE
### (against Calvin University)

96.     Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

97.     This count is pled in the alternative only to the extent that claims of ordinary negligence are barred.

98.     Calvin owed a duty to Ms. Doe as its student and participant in the Program as set forth in Count I above.

99.     Calvin University breached its duty by its acts and omissions, as set forth in Count I above.

100.    Calvin's conduct was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

101.    As a direct and/or proximate result of Calvin's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT III:  WILLFUL AND WANTON MISCONDUCT
### (against Calvin University)

102.    Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

103.    This count is pled in the alternative only to the extent that claims of ordinary negligence are barred.

104.    Calvin owed a duty to Ms. Doe as its student and participant in the Program as set forth in Count I above.

105.    Calvin University breached its duties by its acts and omissions, as set forth in Count I above.

106.    Calvin was aware of the heightened risk of danger facing students, including Plaintiff, during their participation in the Program and the likelihood that students, including Plaintiff, could be assaulted. Despite this, Calvin's' official policy was one of deliberate indifference to a known and obvious risk of assault to participants in the Program.

107.    Calvin exhibited indifference to the likely injury that would result to student participants in the Program, including Ms. Doe, from the breach of its duties.  Calvin's indifference to likely injury was the equivalent of a willingness for the injury to occur.

108.    As a direct and/or proximate result of Calvin's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

### COUNT IV: NEGLIGENCE

**(against Dr. TenHuisen)**

109.     Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

110.     Dr. TenHuisen owed a duty to Ms. Doe as a student and participant in the Program to use ordinary care and act as a reasonably prudent person would in the planning and implementation of the Program.  Dr. TenHuisen's duty included, but was not limited to, the following:

a. a duty to exercise reasonable care in protecting Program participants from the foreseeable risk of sexual assault while traveling in the Philippines;

b. a duty to exercise reasonable care in planning hotel accommodations to protect Program participants from the foreseeable risk that a student staying alone would be unable to alert others if in harm's way;

c. a duty to exercise reasonable care in implementing Calvin's policies and protocols to alert Program participants to the foreseeable risk of sexual assault while traveling in the Philippines;

d. a duty to provide guidance to Program participants for mitigating the foreseeable risk of sexual assault while traveling in the Philippines;

e. a duty to exercise reasonable care in requesting an adequate number of staff sponsors to supervise Program participants during their travel abroad;

f. a duty to exercise reasonable care in supervising student Participants during the Program;

g. a duty to adequately supervise Silliman's performance of its duties under the MOA;

        h. a duty to competently respond to Ms. Doe's assault by providing emergency assistance and supports.

111.    Dr. TenHuisen's duty arose when he administered and took responsibility for the Program.

112.    Dr. TenHuisen's duty arose from a voluntary undertaking when he determined to control all aspects of travel arrangements, accommodations, activities, and safety and security for students participating in the Program.

113.    Dr. TenHuisen's duty arose from a special relationship with Ms. Doe when she entrusted Dr. TenHuisen with full control over all aspects of travel arrangements, accommodations, activities, and when Dr. TenHuisen fostered a special relationship between Program participants and Silliman "buddies."

114.    Ms. Doe's sexual assault was foreseeable and likely, and Dr. TenHuisen recognized the risk of sexual assault for female students participating in the Program in the Philippines when he agreed to implement Calvin policies and procedures requiring training and risk mitigation for the same. Dr. TenHuisen's violation of Calvin's policies and procedures relating to training, supervision, and housing caused Ms. Doe's assault.

115.    The burden on Dr. TenHuisen to prevent sexual assault by following Calvin's policies and procedures is very low and Dr. TenHuisen was able to comply with his duty.

116.    Dr. TenHuisen breached his duty by his acts and omissions including, but not limited to, the following:

        a. failing to protect Ms. Doe from the foreseeable risk of sexual assault while traveling in the Philippines;

20

b.   failing to protect Ms. Doe from the foreseeable risk of sexual assault by the Assailant;

c.   assigning Ms. Doe to a hotel room all by herself;

d.   failing to provide Participants with training on sexual assault and harassment during the pre-Program orientation meeting or at any other time;

e.   requesting a waiver to act as the sole staff member accompanying Participants to the Philippines;

f.   failing to adequately supervise students during the Dinner and encouraging them to continue the celebration at Café Racer along with the Assailant;

g.   failing to adequately supervise Silliman's performance of its duties under the MOA;

h.   failing to respond to Ms. Doe's assault competently and failing to provide emergency assistance or support.

117.   As a direct and/or proximate result of Dr. TenHuisen's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT V: GROSS NEGLIGENCE
### (against Dwight TenHuisen)

118.   Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

119.   This count is pled in the alternative only to the extent that claims of ordinary negligence are barred.

120.     Dr. TenHuisen owed a duty to Ms. Doe as a student and participant in the Program as set forth in Count IV above.

121.     Dr. TenHuisen breached his duties by his acts and omissions, as set forth in Count IV above.

122.     Dr. TenHuisen's conduct was so reckless that it demonstrated a substantial lack of concern for whether an injury would result.

123.     As a direct and/or proximate result of Dr. TenHuisen's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

**COUNT VI:  WILLFUL AND WANTON MISCONDUCT**
**(against Dwight TenHuisen)**

124.     Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

125.     This count is pled in the alternative only to the extent that claims of ordinary negligence are barred.

126.     Dr. TenHuisen owed a duty to Ms. Doe as a student and participant in the Program as set forth in Count IV above.

127.     Dr. TenHuisen breached his duties by his acts and omissions, as set forth in Count IV above.

128.     Dr. TenHuisen was aware of the heightened risk of danger facing students, including Plaintiff, during their participation in the Program and the likelihood that students,

including Plaintiff, could be assaulted. Despite this, Dr. TenHuisen acted with deliberate indifference to a known and obvious risk of assault to participants in the Program.

129.    Dr. TenHuisen exhibited indifference to the likely injury that would result to student participants in the Program, including Ms. Doe, from the breach of his duties.  Dr. TenHuisen's indifference to likely injury was the equivalent of a willingness for the injury to occur.

130.    As a direct and/or proximate result of Dr. TenHuisen's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

**COUNT VII:  VICARIOUS LIABILITY**
**(against Calvin University)**

131.    Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

132.    Calvin is bound by and vicariously liable for the tortious actions of its employees, volunteers, agents, servants, and representatives.

133.    At all times relevant, Dr. TenHuisen was an employee, agent, apparent agent, servant, and representative of Calvin.

134.    At all times relevant, Dr. TenHuisen was hired by Calvin, under its control, regulated by its policies, and the apparent and expressed agent and representative of Calvin.

135.    At all times relevant, Dr. TenHuisen was acting within the scope of his employment and his actions are imputed to Calvin.

136.    Calvin is vicariously liable for Dr. TenHuisen's tortious actions described in Counts IV-VI above.

137.    As a direct and/or proximate result of Calvin's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT VIII: NEGLIGENCE
### (against Silliman University)

138.    Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

139.    Silliman owed a duty to Ms. Doe as a Calvin student and participant in the Program to act as a reasonably prudent person would.  Silliman's duty included, but was not limited to, the following:

> a. a duty to exercise reasonable care in protecting Program participants from the foreseeable risk of sexual assault while traveling in the Philippines;
>
> b. a duty to exercise reasonable care in protecting Program participants from the foreseeable risk of sexual assault by the Assailant;
>
> c. a duty to exercise reasonable care in providing for safety and security during the Program;
>
> d. a duty to exercise reasonable care in ensuring the local laws of the Philippines would be observed by its staff and students, and specifically, the Assailant;

24

e. a duty to exercise reasonable care in adequately evaluating, training, and supervising staff and students participating in the Program.

140. Silliman's duty arose when it created, offered, administered, and took responsibility for the Program.

141. Silliman's duty arose from a voluntary undertaking when it determined that it would be responsible for all aspects of safety and security for students participating in the Program.

142. Silliman's duty arose from a special relationship with Ms. Doe when she entrusted Silliman with control over her safety and security during the Program, and when Silliman fostered a special relationship between Program participants and Silliman "buddies."

143. Ms. Doe's sexual assault was foreseeable and likely, and Silliman recognized the risk of sexual assault for American students traveling in the Philippines when it agreed to offer protection and risk mitigation for the same.

144. The burden on Silliman to prevent sexual assault by vetting and supervising its students and staff is very low and Silliman was able to comply with its duty.

145. Silliman breached its duties by its acts and omissions including, but not limited to, the following:

a. selecting the Assailant to serve as a "buddy" in the Program;

b. failing to protect Ms. Doe from the foreseeable risk of sexual assault during the Program;

c. failing to protect Ms. Doe from the foreseeable risk of sexual assault by the Assailant;

d. failing to adequately vet, evaluate, and train the "buddies" selected for the Program;

e. failing to adequately supervise the Assailant;

     f.   failing to ensure the laws of the Philippines were followed.

146.    As a direct and/or proximate result of Silliman's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation.  Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## COUNT IX: VIOLATION OF TITLE IX
### (against Calvin University)

147.    Ms. Doe adopts, repeats, realleges, and incorporates by reference the allegations set forth in the preceding paragraphs as though they were set forth fully herein.

148.    Title IX of the Education Amendments of 1972 makes it unlawful for a person to be denied the benefits of any educational program receiving Federal financial assistance on the basis of sex.  20 U.S.C. § 1681(a).

149.    Plaintiff is a "person" under Title IX statutory language.

150.    Upon information and belief, Calvin is a recipient of Federal financial assistance for its education program.

151.    The U.S. Department of Education's Office of Civil Rights has explained that Title IX covers all programs of a school, and extends to sexual harassment and assault by employees, students and third parties.

152.    The Assailant's actions and conduct were carried out under one of Calvin's educational programs.

153.    In creating the Program, and other interim programs administered by it, Calvin was responsible for establishing and implementing policies and procedures regarding the security and

safety of its students.  Such policies and procedures reasonably would require adequate supervision of its student participants, adequate training for the Program staff, and adequate guidance and education of the interim program participants pertaining to risks of sexual assault and harassment and measures to mitigate said risks, among other things.

154.    Calvin acted in clear violation of Title IX by maintaining a policy of deliberate indifference to the risk of sexual assault and harassment for interim program participants traveling internationally and in high-risk areas, including Plaintiff. Calvin's policy of deliberate indifference to sexual assault and harassment is evidenced by the following examples, among others:

     i.     maintaining outdated and inadequate sexual assault and harassment policies and protocols for interim program students;

    ii.     failing to provide adequate training and guidance to faculty and staff, obviously necessary for safe and secure interim programs administered by Calvin in the Philippines and elsewhere;

    iii.     failing to provide adequate orientation to students participating in interim programs, obviously necessary for protection against sexual assault and harassment;

    iv.     failing to adequately supervise students participating in interim programs during activities;

    v.     failing to ensure sufficient staffing ratios during interim program trips;

    vi.     failing to require implementation of safety protocols, including but not limited to assigning partners for hotel accommodations, during interim program trips;

      vii.    failing to require implementation of safety and security policies and protocols by staff and students of partner universities, including Silliman, responsible for implementation of interim programs;

      viii.   failing to respond adequately to incidents of sexual assault during interim programs.

155.    Despite the obvious risks associated with the interim programs throughout the world, including those regions of the world with greater security risks, as described in greater detail above, Calvin failed to provide for the security and safety of its student participants.

156.    Said failure on Calvin's part was the result of a deliberate indifference to the risk of sexual harassment and assault faced by student participants on the Program, and on other interim programs administered by Calvin.

157.    Calvin's deliberate indifference created a heightened risk of sexual assault and harassment for its student participants.

158.    As a result of Calvin's deliberate indifference to the obvious risks of sexual assault and harassment in the Program and other interim programs administered by Calvin, and its failure to remedy that risk, Ms. Doe was raped during the Program.

159.    Calvin's deliberate indifference was clearly unreasonable in light of the known circumstances and effectively denied Plaintiff access to educational opportunities at Calvin.

160.    As a direct and/or proximate result of Calvin's actions and/or inactions, Ms. Doe suffers and continues to suffer pain of mind and body, shock, emotional distress, crisis of faith, physical manifestations of emotional distress, embarrassment, loss of self-esteem, disgrace, fright, grief, and humiliation. Plaintiff was prevented and will continue to be prevented from performing daily activities and obtaining the full enjoyment of life, and has sustained and will continue to sustain loss of earnings and earning capacity.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor, against Defendants, and award the following relief:

   i.  Compensatory damages for injuries sustained in an amount to be determined at trial;

   ii.  Punitive and/or exemplary damages in an amount to be determined by the trier of fact;

   iii.  Attorney fees, costs, and prejudgment interest;

   iv.  Other declaratory, equitable, and/or injunctive relief including, but not limited to, implementation of institutional reform and measures of accountability to ensure the safety and protection of students traveling in interim programs; and

   v.  any further relief as this Court deems just and proper under the circumstances.

## **JURY DEMAND**

Plaintiff, Jane Doe, hereby demands a jury trial on any cause of action and claim with respect to which there is a right to a jury trial.

Dated: December 15, 2021

Respectfully Submitted,

By:  /s/ Connie R. Thacker (P49784)

THACKER SLEIGHT
Connie Thacker (49784)
445 Cherry Street SE
Grand Rapids, Michigan 49503
Telephone:  616.888.3810
connie@thackersleight.com

ESBROOK LAW P.C.
Christopher J. Esbrook
Esther C. Yahnig
Erika B. Pedersen
77 West Wacker, Suite 4500
Chicago, Illinois 60601
Telephone: 312.319.7681
christopher.esbrook@esbrooklaw.com
esther.yahnig@esbrooklaw.com
erika.pedersen@esbrooklaw.com

*Counsel for Plaintiff Jane Doe*